840 So.2d 742 (2003)
In the Matter of the ESTATE OF Walter HARRIS,
Q.C. (Quincy Curtis) Harris, Monzola Harris and Barbara Harris, Appellants
v.
Clinton Harris, Verleyria Harris Harrell, and Barbara Harris Marion, Appellees.
No. 20010-CA-01570-COA.
Court of Appeals of Mississippi.
March 18, 2003.
*743 Regan S. Russell, New Albany, for appellants.
Thad J. Mueller, New Albany, for appellees.
Before THOMAS, P.J., IRVING and MYERS, JJ.
IRVING, J., for the Court:
¶ 1. Quincy Curtis Harris filed a complaint in the Chancery Court of Union County against Clinton Harris, Verleyria Harris Harrell, Barbara Harris Marion, Monzala Harris, and Barbara Harris. In the complaint, Quincy sought a determination of the heirs of Walter Harris and Vaughn Harris, a partition of certain land owned by the Estate of Walter Harris, and an accounting for rents from Clinton Harris.[1] Clinton Harris, Verleyria Harris Harrell and Barbara Harris Marion (the Harrises) countered with an answer and motion to dismiss in which they affirmatively asserted that the relief sought was barred by an agreement executed by Quincy, Monzola, Barbara, and the Harrises in 1977. The trial court agreed and granted their motion to dismiss.
¶ 2. Feeling aggrieved by the court's decision, Quincy, joined by Monzola and *744 Barbara Harris, appeals and asserts the following issues: (1) whether the chancellor erred when he found that the contractual intent of the parties was to create a life estate and (2) whether the contractual provision as interpreted by the chancellor created an impermissible restraint on alienation.
¶ 3. Finding no reversible error in the chancellor's determination that the contractual intent of the parties to the agreement was to create a life estate and that no impermissible restraint on alienation existed on the land, we affirm.

FACTS
¶ 4. Walter Harris died intestate on April 18, 1976; he was survived by six children, Joe Willie Harris, Quincy Curtis Harris, Verleyria Harris Harrell, Vaughn Harris, Barbara Harris Marion, and Clinton Harris. Upon Walter's death, each of his children obtained an undivided one-sixth interest in 160 acres located in Union County, Mississippi, and in 60 acres located in Benton County, Mississippi.
¶ 5. Joe Willie Harris died single, intestate, and without children on February 11, 1988, thereby increasing the remaining heirs' interest to an undivided one-fifth. Vaughn Harris died intestate on June 26, 1991. He was survived by his wife, Monzola Harris, and his daughter and only child, Barbara Harris, with both sharing Vaughn's one fifth interest.
¶ 6. Clinton Harris lived his entire life and raised his two sons on the property in the family home, originally built by Walter and his brother during the 1920s. Walter had lived with and was cared for by Clinton during his later years until his death in 1976. Clinton also cared for his brother Joe, who was physically handicapped, until Joe's death in 1988. The remaining heirs of Walter lived in Michigan and Illinois.
¶ 7. Approximately a year after Walter's death, Walter's surviving heirs, including Quincy Harris, executed an agreement in which they acknowledged that Walter's estate had not been administered and that they desired to agree among themselves as to the disposition and handling of Walter's property.
¶ 8. Following the execution of the agreement, Clinton and his family continued to live on the property rent free pursuant to the terms of paragraph three of the agreement. In consideration for the heirs' agreement not to divide "the estate at this time" and granting Clinton "the full use and possession of the house and grounds and all cultivatable land," Clinton agreed to "protect the interests of the remaining heirs in the house and land." Paragraph six provided that each of the heirs "shall be responsible for the payment of one-sixth of the taxes on the land...."
¶ 9. Until 1998, the heirs shared payment of the taxes. In 1998, Quincy did not pay his share and, in 1999, made a partial payment of $150. The balance of the 1998 and 1999 taxes, and all of the 2000 taxes, were paid by Clinton, Barbara, and Verleyria.
¶ 10. On August 4, 2000, Quincy filed the complaint, and the Harrises filed an answer and the motion to dismiss referred to earlier in this opinion.
¶ 11. The chancellor ruled in favor of the Harrises and dismissed the complaint. In his order of dismissal, the chancellor found that Quincy and the Harrises were bound by the July 6, 1977 agreement, which gave Clinton "the equivalent of a life estate in the subject property," thereby barring an action for partition during Clinton's lifetime.

ANALYSIS AND DISCUSSION OF THE ISSUES
¶ 12. Questions concerning the construction of contracts are questions of *745 law that are committed to the court rather than questions of fact committed to the fact finder. Miss. State Highway Comm. v. Patterson Enters., Ltd., 627 So.2d 261, 263 (Miss.1993). Appellate courts review questions of law de novo. Seymour v. Brunswick Corporation, 655 So.2d 892, 895 (Miss.1995). "The initial question whether a contract is ambiguous is a matter of law." Lamb Const. Co. v. Town of Renova, 573 So.2d 1378, 1383 (Miss.1990) (citing Bryant v. Cameron, 473 So.2d 174, 179 (Miss.1985)). The subsequent interpretation of the ambiguous contract presents a finding of fact which is reviewed on appeal under a substantial evidence/manifest error standard. Id.

I. WHETHER THE CHANCELLOR ERRED BY FAILING TO CONSIDER THE TOTALITY OF THE EVIDENCE OF THE PARTIES' CONTRACTUAL INTENT EVIDENT UPON THE FACE OF THE INSTRUMENT
¶ 13. Quincy argues that the inclusion of the words "at this time" in the agreement evidences the parties' intent to forego division of the subject property "at the time of execution of the contract" only, not for the duration of Clinton's life. Moreover, Quincy argues that "the chancellor, [by relying upon and emphasizing] paragraph three of the agreement, failed to fully consider the evidence of the parties' contractual intent and completely [ignored] the parties' expressed intent with regard to the duration and effect of the agreement." He further explains that while the scope of the rights granted to Clinton Harris may have been expressed in paragraph three of the agreement, this paragraph describes only the scope of the powers granted by the parties to Clinton Harris at that specific time, not the duration of the grant.
¶ 14. The primary purpose of all contract construction principles and methods is to determine and record the intent of the contracting parties. Kight v. Sheppard Bldg. Supply, Inc., 537 So.2d 1355, 1358 (Miss.1989). Our supreme court has set out a three-tiered approach to contract interpretation. Pursue Energy Corp. v. Perkins, 558 So.2d 349 (Miss.1990).
¶ 15. First, the "four corners" test is applied, wherein the reviewing court looks to the language that the parties used in expressing their agreement. Id. at 352 (citing Pfisterer v. Noble, 320 So.2d 383, 384 (Miss.1975)). If the language used in the contract is clear and unambiguous, the intent of the contract must be realized. Id. Legal purpose or intent should first be sought in an objective reading of the words employed in the contract to the exclusion of parol or extrinsic evidence. City of Grenada v. Whitten Aviation, Inc., 755 So.2d 1208, 1214(¶ 16) (Miss.Ct.App.1999) (citing Cooper v. Crabb, 587 So.2d 236, 241 (Miss.1991)). Thus, the courts are not at liberty to infer intent contrary to that emanating from the text at issue. Id. (citing Cooper, 587 So.2d at 241). On the other hand, if the contract is unclear or ambiguous, the court should attempt to "harmonize the provisions in accord with the parties' apparent intent." Pursue Energy Corp., 558 So.2d at 352.
¶ 16. Secondly, if the court is unable to translate a clear understanding of the parties' intent, the court should apply the discretionary "canons" of contract construction. Id.
¶ 17. Finally, if the contract continues to evade clarity as to the parties' intent, the court should consider extrinsic or parol evidence. Id. It is only when the review of a contract reaches this point that prior negotiations, agreements and conversations might be considered in determining *746 the parties' intentions in the construction of the contract.
¶ 18. "Of course, the so-called three-tiered process is not recognized as a rigid `step-by-step' process. Indeed, overlapping of steps is not inconceivable." Id. at 351 n. 6.
¶ 19. Clearly, the intention of the parties to the agreement was to address the possession, use, and control of the real property owned by Walter at the time of his death since his estate had not been administered. The agreement was an effort to achieve this goal.
¶ 20. Paragraph two of the agreement reads: "There shall be no division of the estate at this time with all of the real estate remaining intact and not separated or divided in any manner." No other provision in the agreement addressed the time or manner when the estate could be divided. The trial court did not comment on the ambiguity of the phrase "at this time."
¶ 21. Paragraph three of the agreement states:
Clinton Harris shall have the full use and possession of the house and grounds and all cultivatable land situated within the said 220 acre tract. No rent is to be charged the said Clinton Harris for the use of said house and land. In return for the use of the house and land, the said Clinton Harris shall, as reasonably as is possible, protect the interests of the remaining heirs in the house and land and shall in general, look after the house and land; the other heirs all being absentee owners, Clinton shall receive the full benefit of all crops grown upon the land.
¶ 22. The trial judge reached this conclusion without, as previously noted, making any specific comment as to what he thought the parties contemplated by the use of the phrase "at this time." However, when paragraph two, containing the phrase "at this time" is read together with the remaining paragraphs, particularly paragraph three, it becomes readily apparent that the parties' intent was not to limit the restraint on their alienation only to the time of the execution of the contract. Some greater period of time was contemplated. That is what we next consider.
¶ 23. Here the parties agreed that there would be no division of the property "at this time." They did not specify when they would be agreeable to divide the property or whether a single party might assert individually, at some later time, his or her right to have the property divided. The trial judge concluded that the parties intended to give Clinton a life estate in the property. It is clear that the parties desired to keep the home place intact for some extended period of time; therefore, we cannot conclude that the trial judge's findingthat the parties intended to give Clinton a life estate in the propertyis clearly erroneous.

II. WHETHER THE INTERPRETATION OF THE CONTRACTUAL PROVISION ADOPTED BY THE CHANCELLOR CREATES AN IMPERMISSIBLE RESTRAINT ON ALIENATION
¶ 24. The trial court found that the restraint on the parties' right of alienation, by the language of the agreement, was not indefinite but limited to Clinton's life span. Quincy argues that the agreement, as interpreted by the chancellor, confers an indefinite restraint on his ability, and the ability of other signatories to the agreement, to sell or divide their property. Therefore, according to Quincy, the agreement is void as constituting an unreasonable restraint in its scope.
¶ 25. The right of joint owners to have their property partitioned can be restricted *747 or limited for a reasonable length of time by contract, will, or deed. Wiener v. Pierce, 203 So.2d 598, 603 (Miss.1967). Because reasonable restraints of alienation are permissible under Mississippi law, the only question that remains is whether the agreement's restraint on alienation, as measured for the duration of Clinton's life, is reasonable.
¶ 26. In re Estate of Kelly, 193 So.2d 575 (Miss.1967), answers the question of reasonableness for restraints on alienation. In In re Estate of Kelly, the testator gave a life estate in certain real property to his daughter with a proviso that the home property of the testator could not be alienated until the grandchildren of the testator reached forty-five years of age. The Mississippi Supreme Court affirmed the lower court's ruling that this provision was void. However, applying the equitable approximation doctrine so as to give effect to the intention of the testator to the extent the law permitted, the Court upheld the restraint upon the sale of the property in question during the lifetime of the daughter, but would not permit the restraint to be extended beyond her lifetime.
¶ 27. Guided by Kelly, this Court finds that the limitation, as interpreted by the trial court, on Quincy's right to alienate his interest in the property is reasonable.
¶ 28. The final argument presented by Quincy is that the trial court's ruling leaves Monzola and Barbara bound by a contract they never signed or ratified. Vaughn, Monzola's husband and Barbara's father, signed the agreement in 1977. Vaughn was bound by the agreement not to divide the property for the duration of Clinton's life. Vaughn died in 1991, and Monzola and Barbara took his one-fifth interest in the property. As successors-in-interest to the property, Monzola and Barbara can have no greater interest or rights than Vaughn. See Webster v. Parker, 42 Miss. 465, 466 (Miss.Err. & App.1869). Therefore, Monzola and Barbara are bound by the terms of the agreement just as Vaughn would have been had he been still alive.
¶ 29. THE JUDGMENT OF THE UNION COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO APPELLANTS.
KING AND SOUTHWICK, P.JJ., BRIDGES, THOMAS, LEE, MYERS, CHANDLER AND GRIFFIS, JJ., CONCUR. McMILLIN, C.J., NOT PARTICIPATING.
NOTES
[1] Monzola Harris and Barbara Harris joined Quincy in seeking relief although they never filed a formal joinder in the case.