BARNES, J.,
 

 for the Court.
 

 ¶ 1. In February 1966, the City of Her-nando (the City) and Bright’s Water Association (BWA), a private water company, entered into an agreement whereby, in exchange for the City agreeing not to object to BWA’s serving water to the area located within one mile of the City’s limits, BWA agreed, in the event the City ever annexed the area, to release the area from its service area and to give the City the option to purchase the pipes, equipment, and other assets. In 1990, the City annexed the area covered by the agreement. Subsequently, BWA sold its certificated area and assets to North Mississippi Utility Company (NMUC). In 1992, the City purchased all of the water lines and meters located in the annexed area from NMUC for $10,647.60 pursuant to the terms of the 1966 agreement.
 

 ¶ 2. In 2001, NMUC filed a complaint in the Chancery Court of DeSoto County seeking to enjoin the City from serving-water to customers within NMUC’s certificated area. The chancery court granted the injunction on the ground that the 1966 agreement did not comply with the statute of frauds; however, this Court reversed the chancery court’s ruling on appeal and
 
 *777
 
 remanded the case for further consideration. On remand, the chancery court again enjoined the City from serving water to the annexed area, and it is from this judgment that the City now appeals. We reverse the judgment of the chancery court and render judgment in favor of the City.
 

 SUMMARY OF FACTS AND PROCEDURAL HISTORY
 

 ¶ 3. On June 13, 2001, NMUC filed a complaint in the Chancery Court of DeSo-to County seeking to enjoin the City from serving water to customers within NMUC’s certificated area. The complaint alleged that NMUC was the holder of a certificate of public convenience and necessity from the Mississippi Public Service Commission permitting it to serve water in certain areas located within the corporate limits of the City, specifically a one-mile area which contained a subdivision known as Creekside. In December 2001, a trial was held, during which the following evidence was adduced.
 

 ¶ 4. In 1966, the City was providing water service to residents located within its city limits, and BWA was providing service to certain portions of DeSoto County. In February 1966, the City and BWA executed the following agreement:
 

 THIS AGREEMENT made this the 1st day of February, 1966 between the Town of Hernando, Mississippi, hereafter called the [Town], and Brights Water Association, Inc., hereafter called the Association, WITNESSETH:
 

 WHEREAS, the town has consented to the association having its service area within one mile of the town’s limits, that of Hernando, and provide water service to certain customers within this limit, and it is necessary in the event the town should annex within its corporate limits any of the area served by the association to agree on ownership [o]f such water lines:
 

 THEREFORE, IN CONSIDERATION of the Town of Hernando permitting the association to serve customers within one mile of its corporate limits, the association hereby agrees in the event any of the area is ever annexed to the town, on request of the town to release such annexed area from its service area, and does hereby give and grant to the town the option of purchasing from the association all pipe lines, mains, fittings, connections, meters and other assets of the association within the annexed ar[e]a at the fair and reasonable value thereof at the time of such annexation.
 

 WITNESS THE SIGNATURES OF THE PARTIES THIS THE 1st day of February, 1966.
 

 The original agreement was not produced at trial; rather, a copy of the agreement located in the City’s minute books was entered into evidence. Jannett Riley, the City’s clerk, testified that the agreement entered into evidence was a true and correct copy of the agreement which appeared in the City’s minutes books from February 1, 1966. Riley testified that she searched the City’s records, but she was unable to locate the original agreement.
 
 [1]
 
 The copy contained the signature of H.B. Massie, the mayor of the City at the time; however, the signature of Wayne Anderson, the president of BWA at the time, did not appear on the document. Riley stated that Anderson’s name was
 
 *778
 
 typed into the signature line. According to Riley, when she transcribes an agreement into the record, there is an agreement somewhere that has been signed by the mayor and the other parties. She stated that she does not require the other party to come in and sign the official minutes; rather, she types in the name and indicates with a “slash-s-slash” that there is a signature on file on the original document. Although Riley was not the city clerk at the time the 1966 agreement was executed, she testified that to the best of her knowledge, her predecessor, who was the city clerk in 1966, followed the same protocol.
 

 ¶ 5. At some point in 1966, BWA obtained the certificate of public convenience and necessity for the one-mile area referred to in the agreement. On March 12, 1990, the City annexed the area located within one mile of the City’s limits. The area included Creekside subdivision, which is the subject of this litigation. On June 20, 1991, the City’s attorney sent a letter to Anderson informing him of the City’s intention to initiate proceedings before the Public Service Commission to rescind BWA’s certificate of public convenience and necessity regarding the annexed property. The letter referenced the 1966 agreement and stated that the only assets BWA had in the annexed area were a line on Byhalia Road and a line on Holly Springs Road.
 

 ¶ 6. In January 1992, NMUC purchased BWA’s assets, which included a water plant, water lines, and utility easements.
 
 [2]
 
 NMUC also obtained the certificate of public convenience and necessity to serve water to the one-mile area annexed by the City. In April 1992, the City purchased all of the water lines and meters owned by NMUC in the one-mile area for $10,647.60.
 
 [3]
 
 At the time the City purchased the lines and meters, there were only eight houses in the area requiring service.
 

 ¶ 7. Subsequently, Bill Roberson, the president of NMUC,
 
 [4]
 
 built a new water plant near the annexed area in order to serve a new subdivision being developed; however, in anticipation of future development, he built the plant with the capacity of serving more people than were living in the area at the time. Roberson stated that he built the plant in order to serve his certificated area, which eventually included Creekside subdivision, but the City began serving the subdivision without his knowledge. However, Roberson admitted that the City had served water to the area at issue since the annexation and purchase of the lines and meters, and NMUC did not object to this service until it built the new water plant. Roberson stated that he was unaware of the contract between BWA and the City until the legal proceedings began. He stated that Anderson never mentioned the agreement during the negotiations for the sale of BWA to NMUC.
 

 ¶ 8. According to Roberson, the $10,647.60 payment from the City was only for the water mains and meters; it was not
 
 *779
 
 intended to be payment for NMUC’s certificated area. He stated that he sold the water lines and meters to the City because they were too small to service the area. To Roberson’s knowledge, the City has never attempted to obtain the certificated area. According to Roberson, it was unreasonable for the City to assume that when it purchased the water lines and meters in the one-mile area pursuant to the 1966 agreement, it was also purchasing the certificated area and the right to serve the customers in the area when it did not obtain approval from the Public Service Commission. He stated that he would not have been willing to sell the certificated area to the City for what the City paid for the water lines and meters.
 

 ¶ 9. Riley testified that her understanding of the 1966 agreement was that the City was buying the water lines, mains, and meter service in the annexed area “that would give us that area back that we had agreed to with Wayne Anderson in '66,” but she had no documentation to that effect. Riley stated that when the City bought the water meters and lines, the attorney for the City was responsible for preparing the documentation for the Public Service Commission, but she was not aware that he ever did so.
 

 ¶ 10. Joe Frank Lauderdale, an engineering consultant for the City, testified that since the annexation in 1990, the City had spent approximately $650,000 in improvements affecting the area at issue, and the City currently had an outstanding loan of approximately $500,000 for an additional project.
 
 [5]
 
 Lauderdale stated that he reviewed the invoice submitted by NMUC for the water lines and meters and found the price to be fair and reasonable. According to Lauderdale, it would not have been feasible for the City to pay $10,647.60 for the water mains and lines in the one-mile area in order to serve only eight customers.
 

 ¶ 11. Following the completion of the trial, the chancellor found in favor of NMUC and issued an injunction preventing the City from serving water to Creek-side subdivision. The chancellor stated that although the City had the right to acquire any real property located within an annexed area by a voluntary purchase from a water association or by way of eminent domain proceedings, any such acquisition would have to comply with the statute of frauds as it involved an interest in real property. The chancellor then found that the only evidence of the 1966 agreement was the copy of the entry in the City’s minute books, which was only signed by the City’s mayor at the time, not by the president of BWA, and this evidence did not comply with the statute of frauds. He also noted that Lauderdale admitted that the City did not acquire the approval of the Public Service Commission with regard to the purchase. Accordingly, the chancellor concluded that the City had not purchased the right to service the area; therefore, the city was enjoined from providing water seivice in the area.
 

 ¶ 12. The City appealed the judgment of the chancery court, and this Court reversed.
 
 City of Hernando v. N. Miss. Util. Co.,
 
 901 So.2d 652 (Miss.Ct.App. 2004), cert.
 
 denied,
 
 901 So.2d 1273 (Miss. 2005). We found that the 1966 agreement was not subject to the statute of frauds as it was not a contract for the sale or lease of land; rather, “[a]t best, ... the 1966 agreement imposed a burden on the land or granted some rights to supply water to
 
 *780
 
 the owners or occupants of the land.”
 
 [6]
 

 Id.
 
 at 656(¶ 19). Therefore, we remanded the case to the chancery court with the following instructions:
 

 On remand, the primary question for the chancellor to decide is whether Hernan-do’s payment of the BWA and NMUC invoices, during 1991 and 1992, constituted full payment for the rights to serve all of the property annexed in 1990. If Hernando paid fair value for BWA’s pipes and equipment within the area of land annexed in 1990, then the 1966 agreement should be enforced and NMUC’s claims should fail.
 
 [7]
 

 Id.
 
 at 657(¶22). Following this ruling, NMUC filed a motion for rehearing in this Court and a writ of certiorari with the Mississippi Supreme Court, both of which were denied; NMUC did not argue in either instance that this Court’s instructions for the chancellor on remand were erroneous or too narrow.
 

 ¶ 13. On remand, the City filed a motion seeking a determination of whether it paid fair value for the pipes and equipment of NMUC pursuant to this Court’s ruling. The City argued that if it were able to prove that it had paid a fair and reasonable price for the pipes and equipment in the annexed area, the 1966 agreement would be enforceable, and this matter finally concluded. In January 2006, a second trial was held. At the onset of the trial, new counsel for NMUC stated that he was somewhat confused by this Court’s ruling and was not certain that the Court “interpreted this proceeding and what it was about.” He then argued that certificates of public convenience and necessity have value and that the term “other assets” in the 1966 agreement should have been interpreted to include such certificates; therefore, the issue on remand was whether the value of the certificate of public convenience and necessity was greater than $10,647.60, the amount NMUC was paid for the water lines and meters. In response, the City argued that pursuant to the 1966 agreement, NMUC released the portion of its certificated area located within the annexed area in addition to granting the City the right to purchase the pipes and equipment in the area.
 

 ¶ 14. During the second trial, much of the evidence presented was the same as that presented in the original trial. Laud-erdale again testified that $10,647.60 constituted a fair and reasonable price for the pipes and equipment listed on the invoice. He further stated that the City did not have a right to serve customers within someone else’s certificated area. Lauder-dale was not aware of the City’s having taken any action with the Public Service Commission in order to acquire the certificate of public convenience and necessity for the annexed area. He testified that based on his experience, a certificate of public convenience and necessity could have value.
 

 ¶ 15. James Elliot, an expert in civil engineering, testified on behalf of NMUC. Elliot testified that based on accepted valuation methods, $10,647.60 did not constitute full payment for the right to serve all
 
 *781
 
 of the annexed property; rather, according to 1980 prices, fair payment would have been anywhere from $150,000 to $300,000.
 
 [8]
 
 However, Elliot did state that in his opinion, $10,647.60 was fair value for the pipes and equipment located in the annexed area. According to Elliot, if there was no valid certificate of public necessity and convenience, his values of $150,000-$300,000 would not be correct.
 

 ¶ 16. Following the second trial, the chancellor again found in favor of NMUC. The chancellor specifically found that the City had paid fair value for the pipes and equipment located within the annexed area, but “this alone did not constitute full payment for the rights to serve all of the property annexed in 1990.” According to the chancellor, the certificate of public convenience and necessity was a valuable asset for which the City had not paid anything. Accordingly, the chancellor enjoined the City from serving water within the annexed area, and he found that the NMUC was entitled to any monies paid to the City for water service or tap fees provided to customers within the annexed area.
 

 ¶ 17. Following the chancellor’s judgment, the City perfected the instant appeal. The City asserts the following grounds for relief: (1) the chancellor erred in failing to abide by this Court’s instructions on remand and in allowing NMUC to present evidence regarding the value of the certificate of public convenience and necessity; (2) the chancellor erred in not addressing the statute of limitations issue as ordered to do so by this Court; and (3) the chancellor erred in again issuing an injunction against the City when this Court found that the chancellor had erred in finding the 1966 agreement unenforceable. Finding error, we reverse the judgment of the chancery court and render judgment in favor of the City.
 

 STANDARD OF REVIEW
 

 ¶ 18. “Generally, this Court will not reverse a chancellor’s findings unless they are manifestly wrong, clearly erroneous, or an erroneous legal standard was used.”
 
 Martin v. Fly Timber Co.,
 
 825 So.2d 691,
 
 *782
 
 695(¶ 10) (Miss.Ct.App.2002) (citing
 
 Anderson v. Kimbrough,
 
 741 So.2d 1041, 1044(¶ 11) (Miss.Ct.App.1999)). However, “the standard of review for issues concerning the construction of a contract are questions of law that are reviewed
 
 de novo.” Id.
 
 (citing
 
 City of Grenada v. Whitten Aviation, Inc., 755
 
 So.2d 1208, 1214(¶ 16) (Miss.Ct.App.1999)). As this case involves the construction of a contract, namely the 1966 agreement, we will apply a de novo standard of review.
 

 ANALYSIS
 

 ¶ 19. On remand, the chancellor found that the City paid fair value for the pipes and equipment located in the annexed area; however, he further found that the certifícate of convenience and necessity pertaining to the annexed area was “a valuable asset and would be an ‘other asset’ as contemplated by the 1966 agreement, and for which the City of Hernando has clearly not paid anything.” Therefore, the chancellor again enjoined the City from serving water to Creekside subdivision. The City now contends that the chancery court erred in failing to abide by this Court’s instructions on remand and in allowing NMUC to present evidence regarding the value of a certificate of public convenience at the hearing held on remand.
 

 ¶ 20. Before delving into an analysis of the City’s argument, we begin by examining the relevant statutory and legal framework. Mississippi Code Annotated section 77-3-11 mandates that before a public utility may provide service, the Mississippi Public Service Commission must have issued to the utility a certificate of public convenience and necessity. Miss.Code Ann. § 77-8-11 (Rev.2000);
 
 Town of Enterprise v. Miss. Pub. Serv. Comm’n,
 
 782 So.2d 733, 735(¶ 5) (Miss.2001). “The certificate specifies the exact area to be served and grants the utility receiving it the right to serve that area.”
 
 Town of Enterprise,
 
 782 So.2d at 735(¶ 5). However, pursuant
 
 to
 
 Mississippi Code Annotated section 77-3-1, public utilities owned or operated by a municipality are exempt from regulation by the Commission “within their boundaries and up to one mile beyond their corporate boundaries.”
 
 Id.
 
 (citing Miss.Code Ann. § 77-3-1 (Rev.2000)). Therefore, the City was not required to obtain a certificate of public convenience and necessity in order to serve water to the annexed area.
 

 ¶ 21. Nonetheless, the Mississippi Supreme Court has held that a “certificate of public convenience and necessity issued by the Public Service Commission to operate an electric utility is an exclusive right to operate in a designated area, so long as the utility is capable of rendering elective sex-vice to the public located in the area.”
 
 Capital Elec. Power Ass’n v. City of Canton,
 
 274 So.2d 665, 668 (Miss.1973) (citations omitted);
 
 see also A.B.E., Inc. v. City of Oxford,
 
 830 So.2d 615, 620(¶ 21) (Miss. 2002) (“While certainly not an absolute grant of exclusivity, ... a utility’s ability to provide sex-vice in an area that has been certificated to it by the Commission, shall not be infringed upon by an adjacent municipality. This holds true so long as the utility is willing and able to provide adequate sex-vice to the area.”). Hence, although the City was not required to obtain a certificate of public convenience and necessity in order to provide water service to the annexed area, it was not permitted to invade the area simply because it was located within the city limits when NMUC held a valid cex-tificate of public convenience and necessity.
 

 ¶ 22. We now proceed to an analysis of the City’s argument in this case, which must begin with this Court’s specific
 
 *783
 
 instructions to the chancery court on remand. The instructions were as follows:
 

 On remand, the primary question for the chancellor to decide is whether Hernan-do’s payment of the BWA and NMUC invoices, during 1991 and 1992, constituted full payment for the rights to serve all of the property annexed in 1990. If Hernando paid fair value for BWA’s pipes and equipment within the area of land annexed in 1990, then the 1966 agreement should be enforced and NMUC’s claims should fail.
 

 City of Hernando,
 
 901 So.2d at 657(¶22). NMUC argues that “as a result of the remand, the parties were restored to the position on the record occupied at the time of the rendition of the judgment”; therefore, it was entitled to produce “new and additional competent evidence” on remand, specifically evidence regarding the value of certificates of public convenience and necessity. In so arguing, NMUC relies on section 696 of Griffith Mississippi Chancery Practice, which governs the effect of a reversal and remand in chancery court. Billy G. Bridges and James W. Shelson, Griffith Mississippi ChanoeRY Practioe, § 696 (2000 ed.). However, as the City notes, the exact wording of that section refutes NMUC’s argument. The section states:
 

 When a case has been reversed and remanded
 
 without final directions,
 
 the judgment of the appellate court operates to vacate and annul the final judgment appealed from and to restore the parties to the exact position on the record that they severally occupied at the time of the rendition of the judgment in the trial court.
 

 Id.
 
 (emphasis added). Here, this Court provided final directions to the chancellor to be followed on remand. Moreover, as noted above, after this Court issued its opinion containing the instructions to be followed on remand, neither NMUC’s motion for rehearing nor its petition for a writ of certiorari asserted that the language of this Court’s instructions was too narrow.
 

 ¶ 23. At the hearing on remand, NMUC, represented by new counsel, contended that the first sentence of this Court’s instructions stating that “the primary question for the chancellor to decide is whether Hernando’s payment of the BWA and NMUC invoices, during 1991 and 1992, constituted full payment for the rights to serve all of the property annexed in 1990” was sufficiently broad to allow the chancellor to consider whether the certificate of convenience and necessity had value and whether the City paid NMUC fair value for the certificate. However, while this sentence, read in isolation, might support NMUC’s contention, the same cannot be said when the sentence is read in combination with the second sentence, “If Her-nando paid fair value for BWA’s pipes and equipment within the area of land annexed in 1990, then the 1966 agreement should be enforced and NMUC’s claims should fail.” Although the first sentence is somewhat broad, the second sentence is very specific and was intended to clarify the exact question to be answered by the chancellor on remand. Therefore, we find that on remand the chancellor was permitted to consider one issue: whether the City paid fair value for BWA’s pipes and equipment within the area of land annexed. Having specifically found that the City did in fact pay fair value, the chancellor was, in accordance with this Court’s instructions, constrained to find that the 1996 agreement was enforceable and that NMUC’s claims should fail. Regardless, however, of whether the chancellor was permitted to consider the value of the certificate of public convenience and necessity on remand, we find that the chancellor erred in con-
 
 *784
 
 eluding that the certificate was encompassed by the term “other asset” in the 1966 agreement, and because the City had not paid any value for the certificate, it should be enjoined from providing water to the annexed area.
 

 ¶24. The Mississippi Supreme Court has adopted a three-tiered process for contract interpretation.
 
 Gatlin v. Sanderson Farms, Inc.,
 
 958 So.2d 220, 222(¶ 3) (Miss. 2007) (citing
 
 Pursue Energy Corp. v. Perkins,
 
 558 So.2d 349, 351-53 (Miss.1990)). The process is as follows:
 

 First we look to the “four corners” of the contract and at the language the parties used in expressing their agreement. “When an instrument’s substance is determined to be clear or unambiguous, the parties’ intent must be effectuated.” Where the instrument is not so clear, we “will, if possible, harmonize the provisions in accord with the parties’ apparent intent.” If we are unable to determine the parties’ intent from examining the four corners of the instrument, we may apply the canons of contract construction. If the intent is still unclear, we may then consider parol or extrinsic evidence.
 

 Id.
 
 (internal citations omitted). In this case, we find that the language in the 1966 agreement is clear and unambiguous; therefore, there is no need to proceed beyond the four corners of the agreement.
 

 ¶ 25. Initially, we note that when NMUC purchased BWA’s certificate of public convenience and necessity and assets, it became BWA’s successor-in-interest; therefore, it was bound by the 1966 agreement to the same extent BWA was bound.
 
 See In re Estate of Harris v. Harris,
 
 840 So.2d 742, 747(¶28) (Miss.Ct. App.2003) (stating that a successor-in-interest can have no greater interest or rights than his or her predecessor).
 
 [9]
 
 NMUC makes no argument to the Court in this appeal that it is not bound as a successor-in-interest to the agreement; in fact, it refers to itself as BWA’s successor in its brief.
 
 [10]
 
 Therefore, we will hereinafter refer to NMUC as if it was a party to the original agreement.
 

 ¶ 26. NMUC contends that the chancellor was correct in finding that the term “other assets” in the agreement encompassed the certificate of public convenience and necessity; therefore, the City was obligated to pay fair value for the certificate in order to obtain the right to service the annexed area. After a thorough review, we disagree with NMUC’s interpretation of the agreement. The agreement states in pertinent part as follows:
 

 THEREFORE, IN CONSIDERATION of the Town of Hernando per
 
 *785
 
 mitting the association to serve customers within one mile of its corporate limits, the association hereby agrees in the event any of the area is ever annexed to the town, on request of the town to release such annexed area from its service area, and does hereby give and grant to the town the option of purchasing from the association all pipe lines, mains, fittings, connections, meters and other assets of the association within the annexed ar[e]a at the fair and reasonable value thereof at the time of such annexation.
 

 Based on this language, we agree with the City’s contention that there were two separate and distinct parts to the 1966 agreement: (1) a release of the service area and (2) an option to purchase the pipes and equipment located within the service area. Accordingly, NMUC’s obligation pursuant to the agreement was two-fold: (1) first, NMUC was obligated, upon the City’s request, to
 
 release
 
 the annexed area from its service area, i.e., the area covered by its cei’tificate of public convenience and necessity; and (2) in a second and separate obligation, NMUC was required to provide the City with the opportunity to purchase the pipes and equipment located within the annexed area. Therefore, by the agreement’s own terms, the certificate of public convenience and necessity was not encompassed by the term “other assets” because in the preceding provision, NMUC agreed to
 
 release
 
 the annexed area from its service area. As noted above, the City was not required to obtain a certificate of public convenience and necessity in order to serve water within the annexed area; it was merely prohibited from invading the area covered by NMUC’s certificate of public convenience and necessity. By exercising its rights under the 1966 agreement, the City did not invade NMUC’s certificated area; rather, the portion of NMUC’s certificated area represented by the annexed area was released.
 

 ¶ 27. NMUC relies on
 
 City of Jackson v. Creston Hills, Inc.,
 
 252 Miss. 564, 569-70, 172 So.2d 215, 217-18 (1965), in which the City of Jackson extended its city limits to include an area already being served water by Crestón Hills, a private water company, and for which Crestón Hills held the certificate of public convenience and necessity. The City contended that it had the exclusive right to serve water to all of its inhabitants regardless of whether Creston Hills had the certificate of public convenience and necessity for the area.
 
 Id.
 
 at 574-75, 172 So.2d at 219. The Mississippi Supreme Court disagreed, finding that a certificate of public convenience and necessity is “a valuable right, entitled to protection by the courts.”
 
 Id.
 
 at 575, 172 So.2d at 220. The court stated as follows:
 

 [The] City had no right to invade the Crestón area without first paying compensation as provided by Section 17 of the Mississippi Constitution of 1890, which provides that “Private property shall not be taken or damaged for public use except on due compensation being first made to the owner or owners thereof, in a manner to be prescribed by law[.]” ... We hold that the expansion of the city limits to include the Crestón area did not give the City of Jackson any rights whatever to furnish water to the inhabitants of the area certificated to Crestón by the Public Service Commission.
 

 Id.
 
 at 575-76, 172 So.2d at 220. NMUC also relies on Mississippi Supreme Court cases holding that Mississippi Code Annotated section 77-3-11, which, as noted above, exempts municipally owned utilities that operate within one mile of their boundaries from the requirement of a certificate of public convenience and necessity, “does not grant municipalities the ex-
 
 *786
 
 elusive right to operate utilities within one mile of their corporate borders.”
 
 Town of Enterprise,
 
 782 So.2d at 736 (¶¶ 13-14); see
 
 also A.B.E., Inc.,
 
 830 So.2d at 619(¶ 17).
 

 ¶ 28. Based on this authority, NMUC contends that the 1966 agreement should fail for lack of consideration. According to NMUC, because the City did not possess the absolute right to operate within the one-mile annexed area, it did not give up anything by permitting NMUC to serve customers in the one-mile annexed area. We find this argument to be without merit for two reasons. First, the fact that the City did not have the exclusive right to furnish water to customers within the annexed area does not mean that the City did not give value to BWA in exchange for the release of the service area located in the annexed area. The City had the right to object to BWA’s expansion into the area within one-mile
 
 of
 
 the City’s limits, and the City provided consideration when it gave up that right. Had the City objected, BWA may have not been able to obtain the certificate for the one-mile area.
 

 ¶ 29. Second, this Court found that the 1966 agreement was valid and enforceable on the prior appeal of this case. According to the law of the case doctrine, we are not permitted to reconsider this issue on appeal. The law of the case doctrine states as follows:
 

 Whatever is once established as the controlling legal rule of decision, between the same parties in the same case, continues to be the law of the case, so long as there is a similarity of facts. This principle expresses the practice of courts generally to refuse to reopen what has previously been decided. It is founded on public policy and the interests of orderly and consistent judicial procedure.
 

 Moeller v. Am. Guar. and Liab. Ins. Co.,
 
 812 So.2d 953, 960(¶22) (Miss.2002) (citation omitted);
 
 see also
 
 Bridges
 
 &
 
 Shelson,
 
 supra,
 
 § 699. “This doctrine dictates that a mandate issued by this Court ‘is binding on the trial court on remand, unless the case comes under one of the exceptions to the law of the case doctrine.’ ”
 
 Id.
 
 Exceptions to the law of the case doctrine are “ ‘material changes in evidence, pleadings or findings,’ ” or “ ‘the need for the Court to ‘depart from its former decision’ ‘after mature consideration’ so that ‘unjust results’ will not occur.’ ”
 
 Id.
 
 at 960-61(¶ 22). We do not find any of these exceptions to be applicable to this case; therefore, NMUC’s argument that the 1966 agreement lacked consideration is without merit.
 

 ¶ 30. There is an additional reason that
 
 Crestón Hills
 
 and the other cases relied on by NMUC are not controlling in this case; those cases did not involve a contract such as the one at issue here. While it is clear that certificates of public convenience and necessity can have value and that the City did not have an absolute right to serve water in the annexed area, the City did not simply invade NMUC’s certificated area as was the case in
 
 Crestón Hills;
 
 rather, the City exercised its rights under a valid agreement that required NMUC to release its certificated area upon the City’s request. Given the existence of the 1966 agreement, the mere fact that a certificate of public convenience and necessity may have value is not dispositive in this case. NMUC has cited no authority that would prevent BWA from contracting away the right to receive monetary value for its certificate.
 

 ¶ 31. Therefore, we find that pursuant to the 1966 agreement, NMUC was required to release the portion of its certificated area located within the one-mile annexed area in addition to providing the City with the option to purchase the pipes
 
 *787
 
 and equipment located in the area. Not only does the plain language of the agreement support this conclusion, but this is also the most fair reading of the agreement. This is because the City, regardless of the 1966 agreement, always possessed the right to purchase BWA’s certificated area and the pipes and equipment located therein for fair compensation by way of eminent domain. Therefore, under any reading of the agreement other than the one we adopt today, there would have been no reason for the City to enter into the agreement as it would have gained no benefit that it did not already possess. Moreover, the City had been serving at least a portion of the area at issue for approximately twenty years with no objection from BWA or NMUC, and Roberson himself acknowledged that the water pipes and equipment were of no use without the certificated area.
 
 [11]
 
 Finally, our reading of the agreement is consistent with this Court’s directions to the chancellor that if it was determined on remand that the City paid fair value for the pipes and equipment, the 1966 agreement should have been enforced and NMUC’s claims should have failed.
 

 ¶ 32. Although we find that the language of the 1966 agreement is clear and unambiguous, we note that even if the language were found to be ambiguous, our conclusion would remain the same. Under the doctrine of
 
 ejusdem genens,
 
 “[i]n the construction of laws, wills, and other instruments, ... where general words follow an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in them widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned.” Black’s Law Dictionary 517 (6th ed.1990);
 
 see also Cole v. McDonald,
 
 236 Miss. 168, 187, 109 So.2d 628, 637 (Miss.1959). Here, the 1966 agreement gave the City the option to purchase from NMUC “all pipe lines, mains, fittings, connections, meters, and other assets ... within the annexed ar[e]a.” Pipe lines, mains, fittings, connections, and meters are physical assets; therefore, according to the doctrine of
 
 ejusdem genens,
 
 the term “other assets” should be construed to include other physical assets, and a certificate of public convenience and necessity would not constitute a physical asset, but rather an intangible asset. This interpretation is supported by the agreement’s prefatory language, which states, “it is necessary in the event The Town should annex within its corporate limits any of the area served by the association to agree on ownership
 
 of such water lines.”
 
 This language indicates that the water lines and equipment were the assets the parties intended to be purchased, not the certificated area.
 

 ¶ 33. Based on the foregoing, we find the chancellor’s judgment on remand to enjoin the City from providing water to the annexed area to be erroneous. The chancellor found, and the evidence clearly supports, that the City paid fair value for the pipes and equipment within the annexed area. Therefore, pursuant to this Court’s instructions, the chancellor should have enforced the 1966 agreement and concluded that NMUC’s claims were without merit. Because he did not do so, we reverse the chancellor’s judgment and render judgment in favor of the City. We do
 
 *788
 
 not address the City’s remaining grounds for appeal.
 

 ¶ 34. THE JUDGMENT OF THE CHANCERY COURT OF DESOTO COUNTY IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE AP-PELLEE.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
 

 [1]
 

 . According to Riley, the city hall had been moved since 1966, and many of the older records were no longer available.
 

 [2]
 

 . In actuality, NMUC assumed BWA’s outstanding debt as payment for the assets.
 

 [3]
 

 . The invoice was submitted by NMUC and described the items being sold as 2,060 feet of pipe and meter services along Byhalia Road and 2,208 feet of pipe and meter services along Holly Springs Road. The invoice made no specific mention of the certificate of public convenience and necessity.
 

 [4]
 

 .Roberson is also the owner of DeSoto County Water Maintenance Company, which is a sister corporation of NMUC. In November 1991, the City paid DeSoto County Water Maintenance Company $26,357 for a connection line between water lines in the annexed area and the lines that already existed in the City.
 

 [5]
 

 . Lauderdale stated that the improvements were not made specifically for Creekside; rather, they also benefitted areas that were already within the city limits prior to the annexation.
 

 [6]
 

 . We also found that even if the statute of frauds was applicable, the City proved “the existence and contents of the 1966 agreement not only by parol evidence through the testimony of Ms. Riley, but also through the official city minutes that were kept pursuant to Mississippi Code Annotated Section 21-15-17 (Rev.2001).”
 
 City of Hernando,
 
 901 So.2d at 657(¶ 21).
 

 [7]
 

 . The Court also found that the chancellor had failed to address the City’s claim that NMUC’s action was barred by tire three-year statute of limitations set forth in Mississippi Code Annotated section 15-1-49 and, therefore, remanded the issue for further consideration.
 
 Id.
 
 at (¶¶ 23-24).
 

 [8]
 

 . The figures Elliot used to reach these amounts were derived from those used in
 
 Bear Creek Water Ass’n, Inc. v. Town of Madison,
 
 416 So.2d 399 (Miss.1982), in which Elliot testified as an expert witness. In
 
 Bear Creek,
 
 the Town of Madison held a certificate of public convenience and necessity permitting it to furnish water to a portion of Madison.
 
 Id.
 
 at 400. Madison subsequently annexed a portion of Bear Creek's certificated area and filed a petition to condemn Bear Creek's certificate of public necessity and convenience for the annexed area. There were no physical assets owned by Bear Creek in the annexed area; rather, the only asset at issue was the certificate itself. The issue in
 
 Bear Creek
 
 revolved around what formula should be used to place a value on the certificate of public convenience and necessity for the purposes of determining what Madison was required to pay Bear Creek as just compensation.
 
 Id.
 
 The supreme court found that the trial court had utilized an incorrect method of valuation, and the court concluded that in valuing a certificate of public convenience and necessity, “past revenues, present physical facilities, [and] the likelihood of expansion and other business factors, including the likelihood of future revenues,” should be considered.
 
 Id.
 
 at 402-03. Elliot testified that on remand, he projected these figures, and the jury awarded $134,000 to Bear Creek, which amounted to approximately $548 per acre in 1980 prices.
 

 In the case at bar, Elliot used the $548-per-acre figure and multiplied it by the number of acres in the one-mile annexed area to arrive at a $300,000 value for the annexed area, assuming everything was exactly comparable to the situation in
 
 Bear Creek.
 
 He stated that if the situation was only fifty percent comparable to the situation in
 
 Bear Creek,
 
 the certificated area would still be worth approximately $150,000. Elliot stated that using 1990 prices would increase the amount considerably.
 

 [9]
 

 . In
 
 Harris,
 
 Vaughn, who owned a one-fifth interest in a piece of property, had signed a contract agreeing not to divide the property for a certain period of time.
 
 Harris,
 
 840 So.2d at 747(¶ 28). When Vaughn died, his wife and daughter inherited his one-fifth interest in the property.
 
 Id.
 
 Vaughn’s brother argued that the wife and daughter should not be bound by a contract they never signed; this Court, however, found that the wife and daughter were successors-in-interest to tire property and, therefore, were bound to the contract to the same extent Vaughn was bound.
 
 Id.
 

 [10]
 

 . NMUC argued in its motion for rehearing and petition for writ of certiorari,
 
 inter alia,
 
 that it should not have been bound to the agreement because it was not a party to the agreement, had no knowledge of the agreement, and did not assume BWA's obligation under the agreement. As noted above, both the motion for rehearing and the petition for writ of certiorari were denied. In finding that the 1966 agreement was valid and enforceable and in remanding the case to the chancellor with instructions to determine whether the City paid a fair and reasonable price for the pipes, this Court implicitly found that NMUC was bound by the agreement.
 

 [11]
 

 . We also find it noteworthy that Roberson admitted that when NMUC purchased BWA's assets and certificated area, the bill of sale made no specific reference to the certificated area. Roberson staled that the certificated area did not have to be included in the bill of sale because "when [BWA] sold me this, the certificated area had to go along with it.”