741 So.2d 1041 (1999)
Ora Lean ANDERSON, Appellant,
v.
James Lee KIMBROUGH, Appellee.
No. 97-CA-01169-COA.
Court of Appeals of Mississippi.
June 29, 1999.
*1042 Jessie L. Evans, Canton, Attorney for Appellant.
Billy Joe Gilmore, Lexington, Attorney for Appellee.
EN BANC.
SOUTHWICK, P.J., for the Court:
¶ 1. The chancellor confirmed title in James Kimbrough to a one-acre tract and residence conveyed to him in 1993 by Ora Anderson. This was despite Kimbrough's concession that the deed had been executed solely to permit a loan to be acquired by Kimbrough on Anderson's behalf, that Anderson remained living on the land, and that the property was to be reconveyed to Anderson after she satisfied the debt. Settled case law provides that the deed should be considered a mortgage. Though the debt remains outstanding, Kimbrough was not entitled to the property without following foreclosure procedures. We reverse and remand for further proceedings.

FACTS
¶ 2. In 1993, Ora Anderson desired to remodel her house. At trial, she explained the plan that she used to secure the loan.
I went to the bank to make a loan to remodel. My brother was living at my *1043 mom's house, and I needed a place for my children. The bank instructed me that I did not have enough incoming income for them to present it before the Board to get me a loan value that I needed. But that he had instructed me that if I wanted to, I could find some family member to put it in their name and once they make the loan, the bank would allow them to roll it back over to me.
Her friend James Kimbrough agreed to obtain the loan after she agreed to deed the house and lot to him for collateral to be placed with the bank. Thereafter, Kimbrough received the deed, then obtained a loan on June 24, 1993, from Merchants and Farmers Bank in the sum of $10,000, payable in sixty monthly installments of $250.20, with the first payment commencing on August 10, 1993. The maturity date of this loan was July 10, 1998 and the total payments on this loan, which included insurance, would be $15,012.
¶ 3. Anderson and Kimbrough testified about the loan proceeds, though the stories diverge significantly. Anderson testified that after Kimbrough received the bank loan, he delivered to her only $6,000. Some time after receiving the $6,000 installment from Kimbrough, she received another $2,000 from him. Anderson testified that she never received the last $2,000 of the principal amount of the borrowed funds and that $8,000 was her total receipt. To the contrary, Kimbrough testified that he initially delivered $8,000 to Anderson. Although he could not establish the exact time, he testified that the last $2,000 was later delivered to Anderson.
¶ 4. Anderson made the first monthly $250 payment on the loan, Kimbrough the second, and Anderson the third. The fourth payment appears to have been made partly by Anderson's daughter and the remainder by Kimbrough. The fifth payment was made by Anderson. This was her last payment and was made late on January 5, 1994.
¶ 5. Though apparently not known by Anderson, Kimbrough returned to the bank on July 8, 1993, two weeks after the initial loan, and obtained an additional loan of $2,000. The same collateral of Anderson's house and lot were used. The payment on that second loan was due on demand on October 10, 1993. Kimbrough argues that this second loan was to allow him to make another $2,000 payment to Anderson. In his recounting, she received $8,000 initially, then shortly thereafter the remaining $2,000. "That wasn't enough. She wanted two thousand more, and I went and got a side loan for two thousand." Therefore, Kimbrough asserts that Anderson received a total of $12,000. The chancellor found that she had received a total of $10,000.
¶ 6. Anderson asked Kimbrough in January 1994 to seek an extension from the bank on the payments because she had to help her daughter with college finances. She testified that he told her the bank said it was "okay." On that basis Anderson did not make the January and February payments. Anderson alleged that in March 1994, she believed that her extensions had expired. She approached Kimbrough about resuming the payments on the loan to the bank. According to Anderson, Kimbrough instructed her that the bank had advised her to wait on resuming payments.
A. I said, "Do I give, ah, start with January or how do you want me to do this?" He said, "Hold up." He said to wait. Okay, then when April came, he told me the same thing.
In August 1994, Anderson's mother decided to move in with her. According to Anderson:
I had transferred her [Anderson's mother] social security into my name. I had to prove that I owned the house and that she would be living with me through myself and Home Health.
Anderson had been told that she would have to show proof of home ownership. She stated that "on the 15th of August, he [Kimbrough] brought it, and he said, `Oh, *1044 this is your new balance.' And I looked at a balance that went from $13,000.00 to $27,000.00." She was startled by the revelation:
A. I asked him what happened. He told me that his daughter needed some help, and he said  "And I made a loan, but I meant to stop by your house and talk with you about it." And I said, "you meant to stop?" He should have conferred with me before he did that.
¶ 7. Through his brief, Kimbrough notes that he was struggling to meet his personal obligations. He felt as though he needed to consolidate the loans. Kimbrough obtained an additional loan in the sum of $4,000. This amount was added to the amount refinanced on June 15, 1994. Along with the house, Kimbrough listed as collateral a certificate of deposit and forty acres of his land. According to Kimbrough, he used part of this $4,000 loan to pay the interest and principal on the $12,000 loan. The total of the refinanced loan, including the old notes, with the additional $4,000, was $21,558.80the total to be repaid was $27,549.60. These notes were to be paid in sixty consecutive monthly installments of $459.16 each, commencing on August 5, 1994.
¶ 8. Anderson stated that she did not ask Kimbrough to get additional funding. She testified that Kimbrough borrowed approximately $6,000 without her consent. Growing concerned by this latest development, Anderson questioned Kimbrough about how this loan would be repaid.
A. He told me that the loan officer at the bank had told him to pay on the $27,000 up until August of 1995 and then he would have paid his part off. We disagreed, of course, on that.
¶ 9. Anderson testified that she offered to pay the loan if Kimbrough would place the title in her name. She also said that Kimbrough had placed her home on the market for sale. On May 29, 1996, Kimbrough sent a notice to Anderson to vacate the premises. Because no arrangement could be worked out between the parties, on June 17, 1996, Anderson filed her complaint against Kimbrough to set the deed aside and to prohibit Kimbrough from evicting her. Kimbrough answered and filed a counterclaim. A trial was held on February 27, 1997.
¶ 10. On March 25, 1997, the chancellor ruled that title would be restored to Anderson provided that she paid the balance on the original loan by May 15, 1997. The chancellor concluded that "a fair, appropriate and equitable resolution of the matter is for Anderson to pay off the existing loan" with a balance as of February 27, 1997, of $16,070 and on May 15 of $16,313.03. No payment was made. Another hearing was held on May 22, 1997. Anderson stated that she was still unable to make the payment, but was making progress on obtaining a loan. The court ruled that the reasons that she had not gotten a loan, and the likelihood of her acquiring one, were now irrelevant. On a proffer, Anderson testified that a delay occurred because the bank first wanted her to bring current another loan that she had, which may have been an automobile loan that he mentioned in another context. Other delays allegedly occurred because an attorney involved with the title search left for two weeks at a critical time. A loan officer from the same bank as entered the Kimbrough loan stated that some of the paperwork had just been submitted to him, including Anderson's income statement. The witness could not say whether a loan would be entered or not, but it was certainly a possibility. On June 11, 1997, Anderson's complaint was dismissed with prejudice and title confirmed in Kimbrough.

STANDARD OF REVIEW
¶ 11. The appellate scope of review is limited since the Court will not disturb the findings of a chancellor unless the chancellor was manifestly wrong or clearly erroneous, or if an erroneous legal standard was applied. Steen v. Steen, 641 *1045 So.2d 1167, 1169 (Miss.1994). Even so, the "Court will not hesitate to reverse a chancellor when his findings are manifestly wrong or when he has applied an erroneous legal standard." Mississippi Dep't of Human Serv. v. Marquis, 630 So.2d 331, 334 (Miss.1993). The word "manifest" is defined as open, clear, unmistakable, and evident. BLACK'S LAW DICTIONARY 962 (6th ed.1990). Moreover, the manifest error and substantial evidence rule applies only to factual situations and not to questions of law, which require de novo review. Holliman v. Charles L. Cherry & Assocs., Inc., 569 So.2d 1139, 1145 (Miss.1990).
¶ 12. The existence of a contract and its terms are questions of fact to be resolved by the fact-finder, whether a jury or a judge in a bench-trial. Ham Marine, Inc. v. Dresser Indus., Inc., 72 F.3d 454, 458 (5th Cir.1995). Here, however, the core terms were admitted by both parties. The principal task of the chancellor was to determine the legal ramifications of that agreement.

DISCUSSION
¶ 13. The foundation upon which our resolution builds is the following collection of facts that are either agreed or were found by the chancellor after resolving conflicts in the evidence.
¶ 14. Kimbrough had been conveyed Anderson's residence not so that he would own the property in fee but only to permit a loan to be acquired for Anderson. The answer to the complaint admitted this. That reality has never been challenged in these proceedings. As already discussed, Anderson had, at the time of the deed but apparently not now, a close friendship with Kimbrough. After the deed, Anderson remained in possession of her residence. The chancellor resolved a factual dispute by finding that all the proceeds of the $10,000 loan were given by stages to Anderson and were not retained by Kimbrough. Anderson used those funds for improvements to her residence. Though there was a dispute as to whether the agreement required the reconveyance of the property as soon as the loan was made by the bank or only after the payments were completely made, there is no dispute that a reconveyance was to occur. The loan was kept current by Kimbrough, with only a few payments made by Anderson. There were two refinancings by Kimbrough. The dispute is solely between these two parties as Kimbrough avoided default on the various loans with the bank.
¶ 15. Anderson has argued that Kimbrough took advantage of a confidential relationship and also at times after the conveyance engaged in fraud. The chancellor made no specific findings regarding that. Regardless of fraud, the confidential relationship is relevant to whether a constructive trust arose. Such a trust is recognized by statute to have the same effect as a declared trust. Miss.Code Ann. § 91-9-1 (Rev.1994).
¶ 16. The evidence established that but for Anderson's confidence in Kimbrough, this conveyance would not have occurred. A confidential relationship such as would impose the duties of a fiduciary may be a moral, domestic or personal one. Smith v. Smith, 574 So.2d 644, 650 (Miss. 1990). Anderson testified that she and Kimbrough had a personal relationship and that they were "more than just friends." Kimbrough described the relationship as merely a friendship. Regardless, a sufficient relationship existed between the parties to prompt Anderson's placing such extraordinary trust as to convey Kimbrough her house in which she wanted to continue living. Before Anderson agreed to the conveyance, she investigated Kimbrough's claims that another individual had similarly placed all of her assets in his name. The supreme court has found a constructive trust to exist under circumstances similar to these. Pitchford v. Howard, 208 Miss. 567, 584-85, 45 So.2d 142, 148 (1950).
¶ 17. Accordingly, Kimbrough held the property for Anderson as trustee. As a *1046 result of that trust, Kimbrough mortgaged the property. Kimbrough was entitled to be paid the debts he incurred on Anderson's behalf, but that is separate from his right to Anderson's house. He could gain a money judgment and then execute on Anderson's assets wherever they might be found. The house, held in Kimbrough's name, nonetheless remained one of Anderson's assets.
¶ 18. We set the constructive trust issues aside because a more specifically relevant doctrine is unavoidably invoked by these accepted facts. The parties agreed that Kimbrough would borrow money on Anderson's behalf. To permit that to occur, the deed was executed. The deed created the security for the loan and the grantor in the deed received the benefit of the loan. No later than the date on which the debt was repaid, the property would be deeded back. That is a common variant on the well-recognized concept of an absolute deed being used in lieu of a mortgage. Sweet v. Luster, 513 So.2d 1240, 1242 (Miss.1987); Emmons v. Emmons, 217 Miss. 594, 597, 64 So.2d 753, 754 (1953). These sorts of mortgage substitutes create considerable problems of proof, but here the parties agreed as to the facts. It is true that a statute prevents parol evidence from proving that a deed absolute on its face was intended to be considered a mortgage, but that is true only if "the maker parts with the possession of the property" that is conveyed. Miss.Code Ann. § 89-1-47 (Rev.1991). Anderson never parted with possession of her house.
¶ 19. The general interpretation of deeds in lieu of mortgages has been stated this way:
Whenever an absolute deed is established as a mortgage, it will be treated, as between the parties, as if it were a mortgage executed in regular form. All the rights and obligations of the mortgage relationship bind the parties.
GEORGE E. OSBORNE, GRANT S. NELSON, & DALE A. WHITMAN, REAL ESTATE FINANCE LAW § 3.8 (1979) at 43. Once the chancellor found that the conveyance was solely for a loan, this meant that all the "rights and obligations of the mortgage relationship" came into play. We agree "that the parties should not be able to alter the legal character and incidents of the mortgage as developed in a lien jurisdiction by the simple expedient of leaving out" the clause providing for the termination of the grantee-mortgage's interest upon payment of the debt. Id., § 3.9 at 44-45.
¶ 20. A court of equity will "do whatever is necessary" to re-invest title in the grantor, but only upon the satisfying of the debt. Harris v. Kemp, 451 So.2d 1362, 1366 (Miss.1984). When the deed has not been properly recognized as a mortgage, the supreme court has reversed and remanded for the deed to be canceled upon payment of the amount due. Sweet, 513 So.2d at 1242. The chancellor here did not recognize the deed to be a mortgage. Instead, the order of March 25, 1997 provided an opportunity for Anderson to pay the entire amount that was due. Had she done so, then Kimbrough would under the March order have been required to convey the property back to her. When Anderson did not pay, though she alleges she was making progress with a lender for a loan, the chancellor not only determined that Kimbrough was the owner but that she owed rent for the period beginning with his earlier opinion on March 25, 1997.
¶ 21. One issue is whether the chancellor's declaring title to be in Kimbrough once Anderson did not pay the debt is an acceptable if indirect way to recognize the mortgage-nature of the original deed. It might be if under the normal "rights and obligations" of a mortgage, the lender-mortgagee holds title until the debt is satisfied and the mortgage canceled. In other words, if Kimbrough already had title merely by being a mortgagee, then the chancellor's confirming that title might be a fair method of canceling this substitute mortgage. Mississippi law is somewhat different on this point than that of most *1047 states. Most states consider that until a valid foreclosure, title remains in the mortgagor and the mortgagee only has a lien (lien theory of mortgages); a few states hold that a mortgage transfers title immediately (title theory). OSBORNE, REAL ESTATE FINANCE LAW § 4.1 & 4.2 at 115 & 118. A final group has adopted a compromise between the two theories, in which legal title remains with the debtor until default, but the mortgagee has title and the right to possession once default has occurred. Id., § 4.3 at 122.
¶ 22. Our conclusion that Mississippi follows the intermediate theory is based on the supreme court's interpretation given to a long-existing statute. For over 100 years a statute has provided that "the mortgagor or grantor shall be deemed the owner of the legal title ... except as against the mortgagee ... after breach of condition of such mortgage," Miss.Code Ann. § 89-1-43 (Rev.1994) (emphasis added). The supreme court had held that until a breach, the mortgagor has title even against his mortgagee. Buck v. Payne & Raines, 52 Miss. 271, 279 (1876) (on application for reargument); Wright v. Wright, 160 Miss. 235, 279, 134 So. 197, 198-99 (1931). After a breach but prior to foreclosure the mortgagee obtains title, but that title can be asserted "only for the protection of his debt, and to make the security available for its payment." Buck, 52 Miss. at 279. Even when the mortgagee pursues an "appropriate action" such as ejectment to possess the property, "he still holds it as mortgagee, subject to the equity of redemption, until that has been cut off by a sale." Id. Until the foreclosure sale, the mortgagor can regain title by paying the amount due.
¶ 23. Somewhat more recently the court held this:
In Buck v. Payne, 52 Miss. 271, Judge Simrall says: "The legal title may be asserted by the mortgagee, but only for the protection of his debt, and to make the security available for its payment." It will be observed that by section 2779 [section 89-1-43 of 1972 Code], above quoted, the legal title to the property mortgaged after condition broken remains in "the mortgagee and his assigns," and, whatever may be the view taken by the several courts of other states, it is clear that the Legislature thus recognized that an assignment of a mortgage carries with it the legal title of the property mortgaged to the assigns of the mortgagee. In Hill v. Robertson, 24 Miss. 368, this court said: "Upon the maturity of a debt and a failure to pay, the legal title became absolute" in the mortgagee. The court in that case was considering a mortgage without a power of sale, but the case is authority for the doctrine that the mortgagee after the maturity of the secured debt and a failure to pay is the owner of the property mortgaged and is entitled to possession to make his security available.
. . .
After showing the differences between the rights of a mortgagee and a cestui que trust [who has been granted a deed of trust], and the points of agreement between them, this court, in Clark v. Wilson, 53 Miss. [119,] 130 [(1876)], says this: "But the mortgagee, after condition broken, becomes owner of the estate, is invested with the legal title, and may, at law, have a certain redress predicated of his legal right."
Elder v. Jones, 106 Miss. 489, 494-96, 64 So. 212, 213 (1914), reaffirmed in Wirtz v. Gordon, 187 Miss. 866, 184 So. 798, 801-02 (1938).
¶ 24. This intermediate concept has been said to "come closer than the other [title or lien] theories to reflecting what courts do in practice." OSBORNE, REAL ESTATE FINANCE LAW § 4.4 at 123. From this analysis it is evident that the statute leaves title in the mortgagor until "condition broken," but after maturity of the debt and failure to pay, the title shifts to the mortgagee who may foreclose to make those rights secure. Since the mortgagee's rights arise with default, it has been held *1048 that even if a mortgagee is holding under an improper foreclosure, it is still entitled because of this statute to possession and the income until the debt is paid. James v. Jackson Production Credit Ass'n, 389 So.2d 494, 496-97 (Miss.1980).
¶ 25. The mortgage or deed of trust itself may contain a provision that gives the lender the right to take possession after default but before foreclosure. Merchants & Farmers Bank of Kosciusko, Mississippi v. State ex rel. Moore, 651 So.2d 1060, 1062 (Miss.1995). With or without such language, the lender's rights to use its post-default title to take possession or to claim rents and other income are limited by the requirement that possession be acquired peacefully. A mortgagee's seeking possession when a mortgagor unlawfully refuses to deliver it is a explicitly permitted use of the unlawful entry and detainer action. Miss.Code Ann. § 11-25-1 (1972). The key for us, though, is that the intermediate theory for the understanding of title in a mortgage transaction merely explains what occurs prior to a foreclosure sale. It does not eliminate the need for such a sale.
¶ 26. In the present case, the debt had not matured by the time of the chancellor's decree in May 1997. Therefore, as the already-cited authorities hold, regardless of whether title shifts on any default and not just after maturity, that title is subject to Anderson's right to redeem prior to sale. Buck, 52 Miss. at 279. The chancellor could not just declare Kimbrough to have title, at least not title free of Anderson's right to redeem prior to foreclosure. Title remained in Anderson until default and there at least the right to redeem resides today because a foreclosure has never occurred.
¶ 27. Since this was not on its face a mortgage, there are no terms regarding foreclosure. In that event, foreclosure shall be as required for a "sheriff's sale of like property." Miss.Code Ann. § 89-1-57 (Rev.1994). Sheriff's sales of real property are governed by a variety of statutes. E.g., Miss.Code Ann. § 13-3-161 (Supp. 1998).
¶ 28. These are not just technical but otherwise empty procedures. It is true that Anderson may be no more able on remand to acquire the funds necessary to satisfy the debt than she was previously. However, among the protections for debtors that were bypassed here by not having a foreclosure, was the right of debtors to receive any proceeds of the sale in excess of the amount of the debt. The value of this property was probably enhanced by the use of the loan proceeds for renovations; the original value of the property is unclear. Though a foreclosure need not realize the fair market value, there are some basic requirements of sufficiency of price. Wansley v. First Nat'l Bank of Vicksburg, 566 So.2d 1218, 1224 (Miss. 1990); Lake Hillsdale Estates, Inc. v. Galloway, 473 So.2d 461, 465 (Miss.1985). Other interested parties could not bid for the property since under the chancellor's decree Kimbrough automatically received unencumbered title. Further, had foreclosure been sought in 1997, Anderson was entitled to stop it by tendering the past-due amounts plus costs; she did not have to pay the total loan as the chancellor required. Miss.Code Ann. § 89-1-59 (Rev.1991).
¶ 29. In summary, once the chancellor properly found that the transaction's purpose was to permit the acquiring of a loan, he erred by the orders that flowed from that finding. Anderson was the grantor in an absolute deed that was in fact only a mortgage. She was ordered to prepay the entire indebtedness when she was in default only on part. When payment was not made, the chancellor declared that the deed that was really just a mortgage was then converted by operation of law back into an absolute deed. Instead, the court should have ordered the normal procedures for protection of mortgage-debtors to be followed.
*1049 ¶ 30. We reverse and remand, though we affirm the fact findings regarding how much of the loan proceeds were received by Anderson and the amount of payments that she made on the debt. A new calculation will need to be made regarding the current obligation. This means that we are upholding the chancellor's finding regarding what was due at the time of the 1998 maturity date of the loan, which date has now been reached.
¶ 31. If this is seen as a constructive trust without any features of a mortgage, Kimbrough was entitled to a money judgment against Anderson for the amount of the loan due up through the date of the judgment. The loan was not due until July 1998. Since no acceleration clause was in the Anderson-Kimbrough agreement, there was no right in 1997 to accelerate the payments not yet due. Frey v. Abdo, 441 So.2d 1383, 1385 (Miss.1983); OSBORNE, REAL ESTATE FINANCE LAW, § 7.6. The most that Kimbrough should have received then was a judgment for the amount due on the loan on the date of judgment plus other costs incurred. Kimbrough could then execute on that judgment.
¶ 32. If Kimbrough wants to use his rights as mortgagee, he can now undertake to foreclose. The rules described here regarding a mortgage that is written as an absolute deed means that Kimbrough has to seek foreclosure under the general statutes dealing with sheriff's sales. That may now occur subject to Anderson's rights to satisfy the debt and expenses prior to that time. Also an issue would be the relative rights of and the means to protect other secured parties. Those matters can be addressed on remand if they become relevant.
¶ 33. THE JUDGMENT OF THE CHANCERY COURT OF HOLMES COUNTY IS REVERSED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE TAXED TO THE APPELLEE.
McMILLIN, C.J., KING, P.J., BRIDGES, COLEMAN, DIAZ, LEE, PAYNE, AND THOMAS, JJ., CONCUR.
IRVING, J., CONCURS IN RESULT ONLY.