BARNES, J.,
 

 for the Court.
 

 ¶ 1. This case involves a contractual dispute over the sale of a house in Grenada, Mississippi between Robert Willis, the seller, and Gary Houston, the buyer. Willis contends the parties entered into a contract for the sale and purchase of the property, whereby Houston would temporarily rent the house for a period of time and then purchase it. Houston contends that he entered into a contract for the rental of the house with an option to purchase. When Houston failed to go through with the purchase of the house, Willis sued for specific performance in the Chancery Court of Grenada County. The chancery court granted Willis specific performance of the contract, ordering Houston to close on the sale of the property and to pay Willis $365,000. Additionally, the chancery court awarded Willis $62,761.41 in damages, which represented back rent from the date of the breach of the contract until the date of the hearing, and $7,320.34 in attorney’s fees and costs. Houston appealed. We affirm the grant of specific performance and attorney’s fees. However, we reverse and remand for a recompu-tation of damages, consistent with this opinion.
 

 
 *415
 
 STATEMENT OF THE FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. In March 2004, Willis and Houston entered into a contract for the sale of a house owned by Willis in Grenada, Mississippi. Prior to this date, in February 2004, Houston came to Mississippi from Michigan as director of operations for Ice Industries, which owns several industrial plants throughout the United States and Mexico.
 
 [1]
 
 At this time, Houston owned a house in Michigan, where his family resided.
 

 ¶ 3. Initially, Houston spoke with Clara Maxwell, a real estate agent in Grenada, about finding a house “to rent with the option to purchase,” as he needed to sell his house in Michigan before he purchased a house in Mississippi. Maxwell showed him one house to lease, but she testified that to her knowledge there were not any other houses for lease in Grenada. Houston then spoke with Janet Kinard, a real estate agent for Coldwell Banker in Grenada. Kinard showed Houston several houses, one of which Houston was interested in; however, the owner was unwilling to lease it. After a few weeks, Kinard contacted Houston about Willis’s house, which was for sale. Kinard had spoken with Willis about the possibility of leasing his house, but she testified Willis was not interested in leasing it. However, after looking at the house, Houston expressed the desire to “go forward.”
 

 ¶ 4. On March 11, 2004, Kinard provided Houston and Willis with a Coldwell Banker Landmark Realty (“Coldwell Banker”) form contract, entitled “Contract for the Sale and Purchase of Real Estate.”
 
 [2]
 
 Ki-nard claims that she made it clear to Houston that he was entering into a contract to purchase the property. Houston contends that at all times he was under the impression that he was executing a contract to rent the house with the option to purchase the property. Willis testified that he understood this was a sale, not a lease, but he agreed to lease the house while Houston attempted to sell his house in Michigan; then, Houston would buy Willis’s house.
 
 [3]
 

 ¶ 5. Both parties executed the contract, whereby, according to the first paragraph, Houston agreed to “buy” the house from Willis for $385,000. Also, Houston agreed to pay $10,000 in “earnest money” to Cold-well Banker as broker/trustee. A section of the contract entitled “Special Provisions & Contingencies” provided, in pertinent part, that:
 

 SELLER AGREES TO RENT THE PROPERTY TO THE BUYER MONTH TO MONTH NOT TO EXCEED 6 MONTHS AT A RATE OF $2,000 PER MONTH WITH HALF OF THE RENT TO GO TOWARD THE PURCHASE OF THE PROPERTY. BUYER AGREES TO PUT UP $10,000 NON-REFUNDABLE EARNEST MONEY AND TO FORFEIT ALL RENTS PAID IF FOR ANY REASON THE BUYER DOES NOT GO [THROUGH] WITH THE SALE.
 

 The contract stated the closing would be on or before September 11, 2004, “not to exceed six months.” After executing the contract, Houston and his family moved into the house.
 

 ¶ 6. On September 10, 2004, the parties entered into an addendum to the contract (First Addendum) prepared by Kinard.
 
 *416
 
 Houston explained to Kinard that he still had not sold his house in Michigan and his work situation was uncertain. The First Addendum set a new closing date not to exceed another six months, and it stated that “Buyer agrees to put up an additional $10,000.00 non-refundable earnest money. Buyer further agrees to forfeit all past rents and future rents with payment changing to $2,489.18 per month until closing.”
 

 ¶ 7. Then, on March 11, 2005, the parties executed another Coldwell Banker form contract, entitled “Contract for the Sale and Purchase of Real Estate,” that had a few significant changes from the original contract, as well as many of the same terms of the original contract. For clarity’s sake, we shall refer to it as the “Second Addendum.” In the first paragraph, the purchase price for the property was still $385,000; however, regarding earnest money, the purchaser was to pay a “sum of $00.” The Second Addendum stated that the “Buyer agrees to release” to the Seller $20,000, which had been previously held by the broker as earnest money, as “down payment,” on March 14, 2005. Therefore, the balance remaining on the property was listed as $365,000. Also, in the “Special Provisions & Contingencies” section, the Second Addendum stated:
 

 SELLER AGREES TO EXTEND THE ORIGINAL SALES CONTACT, DATED MARCH 11, 2004, PER THE FOLLOWING NEW TERMS: BUYER IS TO RENT THE PROPERTY AT A NEW RATE OF $2,615.06 PER MONTH. PURCHASER AGREES TO PAY HOME OWNERS INSURANCE PREMIUM ... OF $2,604.00 AT THE TIME OF SIGNING. PURCHASER ALSO AGREES TO PAY CITY AND COUNTY TAXES FOR 2005 TAX YEAR ... IN THE AMOUNT OF $4,389.15. THE SELLER AGREES TO CREDIT THE PURCHASER FOR ANY PRINCIPAL PAID UNDER THE NEW TERMS ON THE NEW LOAN WITH MERCHANTS & FARMERS BANK BASED ON THE NEW PAYMENT OF $2,615.06.... THIS AGREEMENT WILL START DATE OF SIGNING NEW SALES AGREEMENT WITH THE FIRST PAYMENT BEING DUE 3-28-2005.
 

 The closing date was changed to March 11, 2006, “not to exceed twelve months.” On March 14, 2005, Coldwell Banker issued a $20,000 check to Willis from Coldwell Banker’s escrow account.
 

 ¶ 8. Both the original contract and the Second Addendum had the same “Breach of Contract” provision, and the provision stated “[sjpecific performance is the essence of this contract.” If Houston breached the contract, Willis was given the following options: “(a) accept the earnest money deposit as liquidated damages and this contract shall then be null and void, or (b) enter suit in any court of competent jurisdiction for damages for the said earnest money deposit, or (c) enter suit in any court of competent jurisdiction for specific performance.”
 

 ¶ 9. On March 1, 2006, ten days before the closing date specified in the Second Addendum, Houston wrote a note to Ki-nard that he did not intend to go forward with the purchase of Willis’s property. The note read: “I know that over the two years of leasing ... we have paid out approx [sic] $85,000 however we respectfully decline our option to purchase and give up all earnest money.” The next day, Kinard wrote a letter to Houston advising him of Willis’s “disappointment” at his not purchasing the property and that Willis was “reserving his right to seek damages in excess of the earnest money deposit” pursuant to the breach of contract provisions of the Second Addendum. In May
 
 *417
 
 2006, Willis’s counsel wrote Houston a letter about the breach of contract and requested that Houston remedy it. Willis never received a response from Houston.
 

 ¶ 10. In February 2007, Willis filed suit against Houston for specific performance in the Chancery Court of Grenada County. Willis also sued Houston for $10,893.52 for “severe” damage to the house while Houston resided there. Houston moved for a dismissal and for summary judgment— both of which were denied. A hearing was held on March 11, 2008. At its conclusion, the chancellor granted judgment in favor of Willis. The chancellor opined that while Houston clearly sought a lease agreement for a house in Grenada, when he could not find one, Houston “found a willing seller [Willis] who allowed him to occupy the property and thus met his needs” under the guise of a contract for sale. The court found “no indication that [Houston] ever intended to follow through with the purchase of that property.” The chancellor noted that the evidence was unrefuted that since March 2006, when Houston notified Willis he did not intend to purchase the property, the property had been continuously marketed for sale with no offers. The court entered a written judgment on April 8, 2008. Houston timely appealed.
 

 STANDARD OF REVIEW
 

 ¶ 11. “The existence of a contract and its terms are questions of fact to be resolved by the fact-finder, whether a jury or a judge in a bench-trial.”
 
 Gandy v. Estate of Ford,
 
 17 So.3d 189, 192(¶ 6) (Miss.Ct.App.2009) (quoting
 
 Anderson v. Kimbrough,
 
 741 So.2d 1041, 1045(¶ 12) (Miss.Ct.App.1999)). This Court “will not disturb the factual findings of a chancellor when supported by substantial evidence unless we can say with reasonable certainty that the chancellor abused his discretion, was manifestly wrong, clearly erroneous or applied an erroneous legal standard.”
 
 Id.
 
 (quoting
 
 White v. Cooke,
 
 4 So.3d 330, 333(¶ 12) (Miss.2009)). The construction of a contract is a question of law that is committed to the court instead of a question of fact committed to the fact-finder.
 
 Id.
 
 at 192-93(¶ 6) (citing
 
 G.B. “Boots
 
 ”
 
 Smith Corp. v. Cobb,
 
 860 So.2d 774, 777(¶ 6) (Miss.2003)). Questions of law are reviewed de novo.
 
 Id.
 

 ANALYSIS
 

 ¶ 12. Houston raises one issue: whether the trial court erred in awarding Willis specific performance and liquidated damages when the contractual language allowed for a choice of one of these options. Houston is referring to the breach of contract provisions in the original contract and Second Addendum, which are identical. These provisions state that if Houston breached the contract, Willis is given the option of accepting the earnest money as liquidated damages and the contract will be null and void; suing for the earnest money; or suing for specific performance.
 

 ¶ 13. The chancellor . held that the terms of the contract and addenda were not ambiguous and clearly were for the sale of the real property and not for a lease with the option to purchase, as Houston claims. The chancellor found liability for the purchase “lies squarely” with Houston, as he was bound by the terms of the contract dated March 11, 2004, and the two addenda, the latest being dated March 11, 2005. We find no error in this regard. Further, we do not interpret the chancellor’s award of damages as what Houston terms “liquidated damages,” but as a separate award. We agree that damages should be awarded here, but we remand for their recomputation, as will be discussed below.
 

 
 *418
 
 ¶ 14. Houston divides his argument into four general matters, which we shall discuss in turn: (1) whether the Second Addendum was part of the original contract; (2) whether specific performance is an appropriate remedy and whether Willis is entitled to it; (3) whether Willis acted in good faith regarding the sale; and (4) the appropriateness of the damages awarded by the chancellor.
 

 1. The Original Contract and the Second Addendum
 

 ¶ 15. Houston contends that the Second Addendum was an extension of the original contract, and Willis did not adhere to its plain language. He claims the understanding of the drafters of the contracts was that the First Addendum was an extension of the original contract; therefore, the March 11, 2005, contract could not be a new contract but a further extension. Houston also contends that the plain reading of the documents shows there was an understanding between the parties that should Houston elect not to purchase the home, his damages would be the loss of earnest money and rent.
 

 ¶ 16. It is undisputed that the original contract of March 11, 2004, was extended by the First Addendum, executed September 10,' 2004. This addendum required Houston to “put up an additional $10,000 non-refundable earnest money.” One year later, another form contract was prepared, with some of the terms of the original sales contract extended. This document, the Second Addendum, dated March 11, 2005, stated in the “Special Provisions & Contingencies” section that the “Seller agrees to extend the original sales contract, dated March 11, 2004, per the following new terms.” However, there was no mention of the forfeiture of the earnest money because no earnest money was paid. Instead, the $20,000 put up by Houston pursuant to the previous contract and addendum was released and paid to Willis as a “down payment” on the sale price of the house, leaving a balance due of $865,000.
 

 ¶ 17. The chancellor opined that the original contract, dated March 11, 2004, was extended by the two addenda. We agree with Houston that the “Second Addendum” was an extension of the original contract, but it did alter the original contract. This determination, though, does not change our affirmance of the chancellor’s ruling. We find no merit to Houston’s contention that Willis did not abide by the plain language of the contract, as will be discussed below.
 

 2. Specific Performance
 

 ¶ 18. Houston makes two arguments regarding specific performance: generally, it is not an appropriate remedy, and even if it were, Willis is not entitled to it.
 

 ¶ 19. Contrary to Houston’s assertions, this Court has considered specific performance as a “particularly appropriate remedy” in matters pertaining to a breach of a real estate contract, because of real estate’s unique nature.
 
 In re Estate of Pickett; Van Etten v. Johnson,
 
 879 So.2d 467, 471(¶ 12) (Miss.Ct.App.2004);
 
 see also Derr Plantation, Inc. v. Swarek,
 
 14 So.3d 711, 720(¶ 20) (Miss.2009). This is especially so if, as here, one party is ready, willing, and able to perform his part of the contract.
 
 See Johnson,
 
 879 So.2d at 471(¶ 11). Generally, specific performance has been “regarded as a remedy for breach of contract that is not a matter of right but of sound judicial discretion,” but “judicial discretion notwithstanding, where a contracting party can feasibly be given what he bargained for, specific performance is the preferred remedy.”
 
 Frierson v. Delta Outdoor, Inc.,
 
 794 So.2d 220, 225-26(¶ 13) (Miss.2001) (citing Os
 
 *419
 

 borne v. Bullins,
 
 549 So.2d 1337, 1339 (Miss.1989)). In exercising this discretion, courts will look at “the adequacy of damages to protect the expectation interest of the injured party,” as well as the “level of transaction costs between the parties, and unless those costs are so high that no voluntary exchange can take place, the court should order specific performance.”
 
 Osborne,
 
 549 So.2d at 1340. The supreme court has noted that while courts continue to give “lip service to the requirement of a demonstration of the inadequacy of the legal remedy,” specific performance is widely available. Additionally, while most cases involve the buyer requesting specific performance from the seller, the law recognizes that the seller has a remedy in specific performance as well.
 
 Id.
 

 ¶ 20. The chancellor reasoned that specific performance was a proper remedy here because “there is no [other] reasonable relief that [Willis] can be awarded having attempted to negate the damages by the continual listing of the property or continual marketing of the property to no avail.” Willis was at all times ready, willing, and able to convey the house to Houston. Because of Houston’s breach, Willis was forced to maintain insurances, taxes, upkeep, and mortgage payments on two houses instead of one.
 

 ¶ 21. Further, clearly, these agreements were for the sale of the property; thus, specific performance is an appropriate remedy. Nowhere within the “four corners” of the contract is it stated that Houston is entering into a contract to lease the property with an option to purchase. In fact, the title of the contract is a “contract for the sale and purchase of real estate.” Houston is actually the party, not Willis, who attempts to argue through impermissible parol evidence that the parties’ intent was to lease the property.
 

 ¶ 22. The chancellor properly exercised his discretion and did not err in ordering specific performance of the sale of Willis’s home to Houston.
 

 ¶ 23. The crux of this case, however, is whether Willis was entitled to specific performance as a remedy. Houston claims Willis made a valid election of remedies by retaining the earnest money as liquidated damages; accordingly, Houston argues Willis is not entitled to any further awards such as specific performance or other damages. We disagree.
 

 ¶ 24. “The primary purpose of all contract construction principles and methods is to determine the intent of the contracting parties.”
 
 Facilities, Inc. v. Rogers-Usry Chevrolet, Inc.,
 
 908 So.2d 107, 110(¶ 6) (Miss.2005) (quoting
 
 Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc.,
 
 857 So.2d 748, 752(¶ 9) (Miss.2003)). We follow a three-tiered approach to contract interpretation.
 
 Id.
 
 at 111(¶ 10) (citing
 
 Pursue Energy Corp. v. Perkins,
 
 558 So.2d 349, 351-53 (Miss.1990)). When interpreting the parties’ intent in a contract, the court will first look to the four corners of the contract itself, read the contract as a whole, and give effect to all of its clauses.
 
 Id.
 
 (citing
 
 Brown v. Hartford Ins. Co.,
 
 606 So.2d 122, 126 (Miss.1992)). The reviewing court’s concern is “not nearly so much with what the parties may have intended, but with what they said, since the words employed are by far the best resource for ascertaining the intent and assigning meaning with fairness and accuracy.”
 
 Id.
 

 ¶ 25. If the contract’s language is clear and unambiguous, “the parties’ intent must be effectuated.”
 
 Pursue Energy,
 
 558 So.2d at 352. Only if the contract is inconsistent or ambiguous can the court go beyond the contract to determine the parties’ intent. If the court can
 
 *420
 
 not ascertain the intent of the parties from the document’s four corners, canons of contract construction may be applied.
 
 Id.
 
 If the intent is still unclear, the court may then consider parol or extrinsic evidence, which would include such information as prior negotiation, agreements and conversations.
 
 Id.
 
 at 353.
 

 ¶ 26. Both parties agree, and the chancellor found, that neither the contract nor its two addenda were ambiguous. Therefore, this Court will analyze the four corners of the contracts to determine the intent of the parties, and not resort to reviewing parol evidence.
 

 ¶27. It is well established that earnest money is considered liquidated damages.
 
 Gunn v. Heggins,
 
 964 So.2d 586, 594(1118) (Miss.Ct.App.2007) (citing
 
 Vanlandingham v. Jenkins,
 
 207 Miss. 882, 891, 43 So.2d 578, 581 (1949);
 
 Sims v. Hutchins,
 
 16 Miss. (8 S. & M.) 328 (1847)). Houston maintains that if Willis accepted the earnest money deposits as liquidated damages, he elected this as a remedy, and the contract is null and void according to the breach of contract provisions. Willis, however, contends that the contract is not void because Willis accepted the $20,000 as a down payment pursuant to the March 2005 Second Addendum, not as liquidated damages. Houston argues that renaming the earnest money as a down payment finds no support in the language of the contract at issue. Again, we disagree.
 

 ¶28. Pursuant to the Second Addendum, Willis had the right to elect his remedy under the three options of the breach of contract provision. Willis did not accept the $20,000 as liquidated damages, but as a down payment. The document clearly states that the sum of zero dollars was deposited with the broker as earnest money, and the $20,000, which had originally served as earnest money was released to Willis as a down payment toward the purchase of the property. When the earnest money deposit was released as a down payment, in effect, there was no earnest money remaining to serve as liquidated damages; thus, Willis had no other remedy available but to sue for specific performance.
 

 ¶ 29. Moreover, the original contract and the First Addendum state the earnest money is “non-refundable.” We fail to see how these funds can function as Willis’s “damages” if Houston had already relinquished his right to the funds before the breach occurred. We also note Coldwell Banker issued a check from its escrow account to Willis for $20,000 as “earnest money” on March 14, 2005, almost one year before Houston actually breached the contract. Since Houston did not breach the contract until after these funds were released from escrow to Willis and were considered a down payment in the Second Addendum, these funds cannot now function as Willis’s election of a remedy. Accordingly, Willis could elect to sue for specific performance as a remedy under the terms of the Second Addendum. Moreover, this document specifically states, at the beginning of the breach of contract provisions, that “specific performance is the essence of this contract.”
 

 ¶30. Based on the foregoing, we find Willis did not and could not make, as a valid election of remedies, the retention of the earnest money as his liquidated damages. Once the parties agreed to the modifications of the Second Addendum, which released the $20,000, previously “non-refundable earnest money,” as a down payment, Willis had the right to sue for specific performance with Houston given a $20,000 credit toward the purchase of the property.
 

 3. Good Faith
 

 ¶ 31. Houston argues that Willis did not act in good faith when he
 
 *421
 
 accepted the $20,000 and then sued for specific performance. Houston contends Willis is merely attempting to gain a monetary -windfall through the lawsuit. It is well established that those seeking relief in equity must come to court with clean hands; the failure to do so may result in the refusal by the court to grant a remedy.
 
 Thigpen v. Kennedy,
 
 238 So.2d 744, 746 (Miss.1970).
 

 ¶ 32. We find no merit to Houston’s argument, which he bases on the contention that Willis elected to accept the $20,000 as a remedy for Houston’s default. As discussed earlier, Willis did not elect to retain the money as his “remedy.” The funds were credited to Houston to be used toward the purchase price of the house. Willis did not receive a “windfall,” and we find no evidence of bad faith on his part.
 

 4. Damages
 

 ¶ 33. Finally, Houston argues that the damages awarded by the chancellor were improper.
 
 [4]
 
 The chancellor awarded Willis $62,761.41 in damages, which represents Houston’s rent, pursuant to the Second Addendum’s rate of $2,615.06 per month, from the time of the breach of the contract in March 2006 until the trial in March 2008. Houston notes that, from March 2004 until March 2006, Willis has taken in $58,315.80 in rent from him. While Houston received full use and occupancy of Willis’s property, Houston complains that to compensate Willis with this award results in a windfall for Willis.
 
 [5]
 

 ¶ 34. The specifics of the rental payments are as follows. Under the original March 2004 contract, Houston agreed to pay $2,000 per month for six months, totaling $12,000, with half of the rent to go toward the purchase of the property. In September 2004, in the First Addendum, the parties amended the rental payment to $2,489.18 per month until the closing, which was the amount of Willis’s mortgage payment. In March 2005, in the Second Addendum, the parties amended the rental payment to $2,615.06 per month, and Willis agreed to credit Houston for any principal paid under the new terms on the new loan with his bank.
 
 [6]
 
 Willis testified: “as far as I was concerned, this was always a sale of the house and he was buying the house, and he’s just making my payment and getting credit for it just like I would if I was buying it.”
 

 ¶ 35. The supreme court has held the appropriate standard for establishing a measure of damages for breach of contract is:
 

 to put the injured party in the position where [he] would have been but for the breach. Contract damages are ordinarily based on the injured party’s expeeta
 
 *422
 
 tion interest and are intended to give him the benefit of the bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed.
 

 Frierson,
 
 794 So.2d at 225(¶ 13) (quoting
 
 Theobald v. Nosser,
 
 752 So.2d 1036, 1042(¶ 22) (Miss.1999)). “However, it is never contemplated that the injured party be placed in a better position than he otherwise would have been in if the contract had been performed.”
 
 Polk v. Sexton,
 
 613 So.2d 841, 844 (Miss.1993). Also, “[a] party is not entitled to a recovery of damages if it would constitute a windfall or ‘double recovery.’ ”
 
 Garris v. Smith’s G & G, LLC,
 
 941 So.2d 228, 232(¶ 10) (Miss.Ct.App.2006) (citing
 
 Ciba-Geigy Corp. v. Murphree,
 
 653 So.2d 857, 873 (Miss.1994)).
 

 ¶ 36. In the instant case, we find, as did the chancellor, that the award of specific performance does not “put [Willis] in as good a position as he would have been in had the contract been performed” at the time specified in the contract. During the two-year interim, Willis has continued to pay mortgage payments, insurance, and taxes that he would not have had to pay had Houston closed on the sale in a timely manner.
 
 [7]
 

 ¶ 37. While this Court affirms the propriety of a damage award in this case, we find it necessary to remand this case to the chancery court for a recalculation of the amount of damages. In the Second Addendum, Willis specifically agreed to credit Houston with any principal paid on Willis’s mortgage from the rental funds paid by Houston. As the chancellor ordered Houston to pay the remaining contract price of $365,000, and damages based upon the rental rate of $2,615.06 from the time of the breach until the judgment, Houston is not being credited with the amount of principal contained in these payments, and Willis is receiving a double recovery to that extent.
 

 ¶ 38. The record before us does not indicate how much of the mortgage payment was actually principal; therefore, we remand this case in order to ensure that Houston receives credit for any principal payments contained in the damage award. On remand, the chancellor may also consider whether the award should be further calculated to compensate Willis for his payment of insurance and taxes since the date of Houston’s breach of contract.
 

 CONCLUSION
 

 ¶ 39. Based on the foregoing, we find that the chancellor did not err in awarding Willis specific performance on the sale of his property. The contract was clearly for the sale of the house, not a lease with an option to purchase. Willis did not accept the $20,000 as liquidated damages but as a down payment according to the Second Addendum. Therefore, Willis had the right to sue for specific performance under the Second Addendum. We remand, however, for recalculation of the damage award.
 

 ¶ 40. THE JUDGMENT OF THE CHANCERY COURT OF GRENADA COUNTY IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL
 
 *423
 
 ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ„ CONCUR. IRVING, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.
 

 [1]
 

 . Ice Industries was attempting to salvage a Grenada stamping company.
 

 [2]
 

 . Kinard was a dual agent for both Willis and Houston.
 

 [3]
 

 .We note, as the chancellor did, that this was never a part of the contractual agreement between the parties.
 

 [4]
 

 .Houston argues that this award of damages is improper in part because Willis did not request it. He states the Second Addendum did not provide for the payment of rent in the event that Houston breached the contract, and that Willis offers no documentary proof at trial that he incurred this loss. We find from a review of the complaint that Willis alleged that Houston should pay $365,000 for the purchase of the home together with "such other damages for his breach, including, but not limited to ... city and county taxes, and payments [Willis] has made since March 2006.” Further, in the damages clause, Willis prays for the sum of $365,000 "together with such other damages for breach to be proven upon hearing.” We find this request sufficient.
 

 [5]
 

 . Houston does not contest the award of attorney's fees and expenses to Willis in the amount of $7,320.34.
 

 [6]
 

 . We note that the Second Addendum's rental payment of $2,615.06 is slightly higher than Willis’s actual mortgage payment of $2,489.18 per month; however, it may be that Willis's mortgage payment had increased since the date of the First Addendum.
 

 [7]
 

 . Additionally, we note Willis's complaint requested $10,893.52 in costs resulting from alleged severe damage to the home during Houston's residency; however, these damages were never brought up at trial, and since Houston is being ordered to purchase the home, there is no damage to Willis in this regard.